Good morning, Your Honors. May it please the Court, Melissa Baldwin on behalf of the appellant Jermaine Carson. We are asking this Court to reverse the District Court's denial of the motion to suppress. Agent Cortell, without reasonable suspicion, detoured from Washington's suspended license investigation by researching the criminal history of the Highlander and its registered owner. This prolongation provided Hayes with a window to observe facts supplying probable cause that resulted in the firearm's discovery. This was a violation of Rodriguez and Mr. Carson's Fourth Amendment rights and should have resulted in granting the suppression motion. So, first starting to Ms. Agent Cortell's detour in his patrol car where he admitted to researching both the Highlander's involvement in any past crimes and the registered owner's criminal history. Neither one of these related to the suspended license investigation itself nor was it an ordinary inquiry incidental to that investigation under Rodriguez. Why not? Well, the ordinary incidents in a traffic stop must have a close connection to roadway safety and in this case, the fact that the Highlander may have been used in a past crime has no impact on whether or not it can be operated safely. What if it was hijacked that day? If it was hijacked that day, I still, the fact it was hijacked, the fact someone hijacked it might suggest criminal activity or danger, but the mere fact a car was involved. So if Agent Cortell had some reason to suspect that this car was hijacked, I think that would be a different case. It would be, yeah, but what, doesn't Rodriguez specifically allow an officer to check proof of insurance and registration? It mentions those things specifically, right? It does, and we have, I believe Agent Cortell acknowledged he did that in addition to looking at the vehicle's involvement in any past crimes. I guess my point is that I don't think Rodriguez talked about those being the only things and I'm just curious as to why, if that, if that, I mentioned the car being hijacked or if there was evidence that if he's looking for, if he's considering officer safety, if the car had been part of a recent crime, you said it had been a long time, it could have been one long time ago, maybe true, but you don't know that on the front end. What if, what if it had been involved in a crime earlier that morning? Well, officer safety is a different category than the ordinary incident. So my understanding based on Rodriguez is the ordinary incidents are categorically allowed in any and all traffic stops versus officer safety in this court's recent decision by Judge Benjamin and Martin, a officer safety measure, the facts have to show that the safety concern, that the safety concern warrants those measures in that particular case. And so here, again, we have Agent Courthouse had no, had no reason to suspect that this car was recently hijacked. The only thing they knew was Mr. Washington was operating on a suspended license and was complying with the officer's demands and, and so on those facts, officer safety was not involved. Let me ask you this though, because I think just as a follow up to Judge Quattlebaum, I think Rodriguez, but doesn't Rodriguez, Rodriguez says that unrelated inquiries do not measurably extend. So how is this measurably extended? Because I think the time, the time between when, I'm going to get all the officers named Courthouse, is in the car running the license or the, it's like 30 seconds because it all kind of seems like it happens simultaneously. Hayes is at the car when he says he smells the marijuana. So how is that not measured, measurably extended or how, why is that measurably extended, I should ask? My understanding of Rodriguez is there is no de minimis exception. So if the officer safety measure is not, you know, reasonably permitted under the facts of the case, even if it was a millisecond, Rodriguez is violated at that point because the seizure has been, is the product of unreasonable delay at that point. So in this case, we know Quartel was in his car for, I believe it was 30 seconds before Hayes, you know, testified he detected the marijuana odor. And Quartel is saying that he has to do this before he can even start looking, I guess, into what you would consider criminal activity. He has to do his duo, I guess that we have duo mobile, but this two-step authentication. So he's trying to do that during this time. And so I'm just curious as to what the extension is that you find, because we don't exactly know when. I guess he starts suspecting the criminal activities, I think he speaks to the other officer who says, no, we can't do the, we can't call the dogs because we don't have any reasonable suspicion, but by that time, Hayes is already at the car and smells based on the timing and it's smelled the marijuana. Right? Right. By the time Quartel is discussing the drug dog with DeStefano, we would concede Hayes has detected the marijuana odor. But as regards to the timeline, you're correct. We don't have a precise millisecond pinpoint when it was delayed. We say, and that's because the government did not present a timeline of Quartel's actions in the patrol car. So all the government established was that Quartel, when he departed the stop at 1125.22, he proceeded to engage in inquiries that were unrelated to the stop and prolonged it under Rodriguez. Counsel, can I, to follow up on your answer and Judge Benjamin's question, as I understand that you're got three, three aspects of what you claim to be a detour, there's the checking the vehicle history, there's checking the owner's history, and then there's the inquiry about the dog sniff. Is what you just said that Officer Hayes had smelled marijuana by the time of the dog sniff, does that make that detour, you know, moot or harmless or, you know, non-impactful here? Well, I think the dog sniff still represents a Rodriguez violation because... I got you. But if he's already smelled marijuana, and the timeline seems to show that, it seems like that, whether it is or it is not, you know, is kind of beside the point. Tell me why I'm wrong on that. So well, at that point, I think that the remedial question becomes more difficult, but I think the government's forfeiture of inevitable discovery would come into play here, where the government did not raise inevitable discovery either in the district court or in this court. Wouldn't that have been a separate issue, I mean, waiver aside, I mean, in terms of whether the dog sniff question, you know, represented a Rodriguez violation, doesn't it... How can you have that if there was a separate basis for, you know, asking, you know, Washington or Carson to get out the car and proceed in that direction if they've already smelled marijuana? Well, I think it's a problem because of three reasons. The first, the point established was only that Hayes could have extended the stop when he detected marijuana. We know he didn't. We know he talked about candy at the car. And then secondly, and that goes to Rodriguez, where we have this dead time in the stop then where, you know, Mr. Hayes is engaging in small talk with the driver and not investigating the crime for which he has suspicion, while Officer Cortell is simultaneously not investigating. So we have this dead period of time where no officer is investigating criminal activity they have justifiable suspicion for, yet these motorists are detained on the side of the road. But I thought Hayes testified that he immediately smelled marijuana when he walked up to the car. He did, but he did not proceed to investigate or do anything to verify or confirm, excuse me, to verify or dispel that suspicion. Instead, he engaged in small talk with Mr. Washington. And so, and then the third reason, the fact that Hayes merely could have extended the stop, that also, that is just one part of the inevitable discovery doctrine. So if that showing alone wouldn't even justify an exception to the exclusionary rule, I don't see it how it could then remedy the fact that there was this dead time where, you know, one officer was engaged in a fishing expedition and another officer wasn't investigating the crime for which he suspected. So those would be like three of the reasons why I think the drug sniff is still a problem, but I agree, I think the remedial issue goes away when you look at the earlier detours. And so we've talked a little bit about the vehicle's criminal history, but I also want to address the registered owner's criminal history. And in that case, I think, in that case, again, there's no ordinary incident or officer safety measure because Agent Cortell did not know the registered owner was present in the vehicle when he ran that stop. So the fact I lend my car to a friend, you know, the fact I may have a prior, you know, arrest or felony conviction doesn't tell the officer anything about whether or not my car can be safely driven or whether or not he is facing a risk at a traffic stop that I'm not present in. And it wasn't cited in our brief, but I noticed it as I was re-watching the videos. If you look at Officer DeStefano's body-worn camera after the search at 1141-38, Agent Cortell admits he didn't know the registered owner was present in the car. He asked Mr. Washington, does your girlfriend or wife or whoever that is, referring to the female passenger, have a license? So he's acknowledged that he was just engaged in a fishing expedition. He was looking for a reason to expand the stop when he was looking up the registered owner's criminal history. There was no reason to think it had anything to do with Mr. Washington's suspended license or, you know, any safety issues that may have been present at the stop. I thought the record showed that Cortell, I may be pronouncing that wrong, recognized when the officer went to the car and was doing the check, now you challenged what he was doing, but in the process of doing that, realized that who he just saw in the car was consistent with what he saw in the ownership records. I believe his testimony at TOR was he thought the registered owner matched or closely matched, but I think the body-worn camera contradicts the notion that he recognized in that moment that the female passenger was the registered owner because he acknowledges on the body-worn camera he does not know who she is or whether or not she has a license. It was once he got information about the owner that he then matched up with what he had just seen. He had already run that inquiry when he had made the admission saying, who is that, does she have a license? So I think that showed. Who said that? What officer said that? Agent Cortell. So based on, if there are no further questions on the seizure, then I will move on to the frisk. If you agree that there was, you know, a Rodriguez violation warranting, that warrants reversing the denial of the motion to suppress, you don't have to reach this issue. But if you disagree with us, then, you know, Mr. Carson's frisks remain live. You know, we've made an argument that there is reason to, that the Psaki presumption has been undermined and that, you know, marijuana no longer presents the dangerousness that might have been present when it was first announced. But we are bound by that decision, are we not? So you are bound if there isn't, you know, if there isn't one of the exceptions, like the rationale being undermined applies. So, you know, we've argued that that exception, that there is, you know, grounds for which you can find Psaki, Psaki's rationale has been undermined. I acknowledge it's weak and it's probably more prudent to go on bonk, but I made the  So, but that's it. I have the Rooks case, this court's case in the Rooks that says that there's some suspicion of drugs that they can pack down. Right. Well, I'm not sure. I'm sorry. I can't recall if Rooks involved marijuana because ours is limited to marijuana, which I think is illegal drugs.  So, so our, our, our challenge to Psaki would be limited to, to marijuana as opposed to drugs generally. And we think, you know, and we think Psaki did, did get it wrong, essentially, and it's inconsistent with fourth amendment jurisprudence, which generally requires case specific findings to warrant intrusions. I mean, the Supreme Court's recent decision in the lane case where it rejected a categorical rule that police can always pursue a fleeing misdemeanor into home. They rejected it because, listen, it might be the case that that's usually going to present an exigency that's going to warrant, but it's not always the case. Isn't it here also, it was in Sakia, also a presumption that could be rebutted in under certain circumstances, perhaps not present here. It says it's rebuttable, but I think in practice it's, it's effectively an irrebuttable presumption, especially in the marijuana context, because in marijuana, in the marijuana context, the whole point is the presence of marijuana doesn't give any indication of danger. So I don't know how a defendant is supposed to disprove a danger he rejects exists in the first place. Well, hypothetically, you could have a situation where an individual was leaving a medical dispensary, had marijuana, had a prescription. There could be facts not present here that could rebut the presumption that there's a connection between crime and use of marijuana. But in this circumstance, none of those, none of those are, I don't think you've pointed to anything that would rebut the presumption here. There's not that, but then I think it goes back to when it comes to these warrantless intrusions, it's the government's burden to, you know, initially justify that intrusion, not on the defendant. And so in that case, it should be, the onus should be on the government to show not that there was, that any safety concerns were allayed, but that they were present in the first place. And I see my time has expired. So if there are no further questions, I reserve some. Thank you, Counselor. You have some time left on rebuttal. Thank you. Counselor? May it please the Court. Amy Ray for the United States. Your Honors, under Rodriguez, it's a three-part inquiry. First, did the officers divert from the traffic-based inquiry and the mission? Two, did that deviation prolong the stop? And three, was the detour supported by probable cause? And in Palmer, this Court stated, unless Palmer can demonstrate some constitutional violation between the time the stop began and the point the officer smelled marijuana, the evidence cannot be suppressed. I believe that those, that that three-part inquiry and the facts of this case establish that the stop was not prolonged within the 30 seconds between the time that Officer Cortel, Agent Cortel got into his car and Officer Hayes smelled the marijuana. I would remind the Court that this is an objective inquiry. Whatever Hayes was thinking in his head about what he was planned to do with that probable cause is really irrelevant. What matters is, did probable cause or reasonable suspicion exist? And if it did exist, then there is no constitutional violation because the officers had reasonable suspicion to search the car to detain Mr. Carson. So, Counselor, are you saying, is that argument based on the fact that 30 seconds isn't enough to prolong the extension? I want to make sure I understand what you're getting at. Is it? Sure. Are you talking about because it's only 30 seconds, we don't have an issue? Well, I think the 30 seconds is relevant to determining whether we have an issue, but the original argument was that the inquiry with Officer DiStefano about the drug dog, do you have anything else? And the 30 seconds is 30 seconds within two minutes that Officer Cortel was in the car. So in other words, the District Court... I still want to make sure I understand you. So, when Hayes smells marijuana, your argument is there's probable cause at that point? That's right. Okay. So I think I hear you saying that, what's the situation up until that time? Are you saying that... Tell me about the 30 seconds. I want to make sure I understand that. So the question is, did it prolong the stop? And I think I have a couple of different arguments with respect to that 30 seconds. First, under the facts of this case, we can defend the inquiry into the car and into the owner, and I can go into that. So they would have to show that within that 30 seconds, the stop was prolonged. So the first issue is, there's no evidence to suggest it was. And the second would be, given all of the things that Agent Cortel testified that he had to do, which included finding the citation book and looking up statutes and all of that, the District Court's determination that the stop was not delayed by that 30 seconds... So your point is, the part of the activities that the officer did that aren't prolonging or even argued to be prolonging, there's no showing that they took less than 30 seconds. Exactly. Or that they could have. Now, I will defend the officer's, Agent Cortel's, looking into what had happened with the car. He explained, in part, that because it was an unlicensed, suspended license seizure, that car, something was going to have to be done with the car. And so, and as your Honor noted, there could be other reasons that that car had been involved in a crime, et cetera, and that's reasonable for safety reasons to look that up. But he also, for traffic-related purposes, what was going to happen with that car. And he did testify, I think it's at page 201 or 204, I think it's 204 of the Joint Appendix, that the passenger matched or closely matched what he saw with respect to the owner. And this Courts in Hill 2017 decision recognizes that it's perfectly appropriate for an officer to investigate not only the driver, but also the passenger's criminal histories. So I think all of those factors rebut the suggestion that by looking into the owner's criminal history, there was somehow a violation. But I would also, your Honor. So just to follow up on the Hill question, the Hill question, Hill does talk about the other passengers. You can ask for their license and run a check on that. But I think the argument would be, if you don't know that the owner is the owner, you're not doing that. You're running it at the time you're doing it, at least, on someone you don't know whether is in the car or not. Right. Well, first he ran the registration. And he says that the image matched or closely matched. I think there's a reasonable inference that at that point, he thinks, perhaps, and I'm not sure about what my friend talks about in terms of the later video and what it says, because I don't recall that. But I also believe that it was perfectly appropriate under this court's precedence for officer safety reasons for him to check on the criminal history of somebody who looks, of the owner, if the owner resembles one of the passengers. And that's what he testified to. So it, I don't have any evidence as to how long any of that took. No, we don't. But we do have evidence as to all of the tasks that Officer Cortel had to accomplish. And the particular circumstances of this case, which is that Officer Agent Cortel, rather, was an ALE agent who really was relatively unprepared for the traffic stop, but empowered and authorized to conduct the traffic stop. So what Rodriguez says is that you can't do sort of a reasonable time period test, right? You can't say, well, this officer conducted the stop in two minutes. Most officers would take five. So he's got three minutes to go into investigating some other possible crimes. In this case, the officer was sort of the opposite of that, probably the quintessentially inefficient officer. So considering all of the things that Agent Cortel testified that he still had to do, it's not, it's perfectly reasonable for the district court to determine that even if the inquiry into the owner took, what, five seconds, ten seconds, fifteen seconds, one minute, that it didn't delay the traffic stop. It didn't prolong, I would say, Mr. Carson's seizure. I would also say that the other facts that are really important here are what Agent Cortel did discover about Mr. Washington. He was what he called a known, a known, well, actually Agent Escobedo, Officer Escobedo said that, I'm sorry. But he did learn right away that Mr. Washington, the driver, had violent felonies and was considered a violent offender. So that would have heightened the safety concerns. And so whereas in a normal stop, perhaps checking the owner's history or criminal history might, I don't really think that makes sense, but especially if they resemble one of the passengers. But even if it did, in this case, we do have heightened safety concerns. And he also knew from the briefing he testified that these gentlemen were, that he didn't know at that point that Jermaine Carson was in the car. But he did know that Calvin Washington was suspected of engaging in very recent criminal activity just a quarter mile away at the Aston Park Apartments. So with all of those circumstances, the district court did not err when it determined that the inquiries that the defendant suggests are violated as constitution, that they did not prolong the stop. And as long as it did not prolong the stop, there is no constitutional violation and no basis for suppressing the evidence. Turning to the frisk, Psaki's good law, in addition to that, and I will note not only do we have Rooks, but there's a 2019 McCoy decision. It's unpublished in this circuit, but it did say that even though marijuana, the possession of it is legalized in many states, that is not, does not undermine Psaki. And of course, it's not legal in North Carolina for any purpose. The possession is not. Wasn't it just declassified last week by the federal government? Well, yeah, I think that's right, Your Honor, but it is still not legal to possess in North Carolina. But it does seem that the presumption from decades ago of a nexus between marijuana and criminal activity does seem to be particularly weakened because of the changes in the law, both at the state level and the federal level. And it just strikes me that if the Psaki presumption is maintained, then really any marijuana user effectively loses their Fourth Amendment rights when they're using marijuana, whether in a car or on the street. The presumption seems particularly problematic given the changes in the law. I don't disagree with you, Your Honor, that the law seems to be, you know, evolving when it comes to, or at least the circumstances when it comes to marijuana. But when it comes to the law, who's a danger? Or who's a...  Sure. The connection between criminal activity and this particular drug seems to be weakening. I think that's right. I mean, I also think that, so let me, the criminal activity is there in North Carolina. There's no question that it's unlawful. But the dangerousness, I think, is what is fair to say is evolving. Like whether or not we can assume that someone who's violating the law because they are possessing a small user amount of marijuana or whatever, whether or not that suggests that they are automatically dangerous, that might be something that this court at some point will reconsider. I do note, as Your Honor did during my friend's argument, that there is a way, what Psaki says is, unless the facts ameliorate the safety concern. And there were no facts that would ameliorate the safety concern in this case. By the time they frisked Mr. Carson, Officer Escobedo knew that he had previously been convicted of armed robbery, kidnapping, assaults, and they had seen the digital scale that had white residue on it that was consistent with fentanyl. So this is not that defendant that we don't have to be concerned about. So I don't think that even if this court were to consider or want to revisit Psaki, that this is the case, this is the best vehicle for doing that. And of course, this panel wouldn't be empowered to do that anyway. So there were, but there were many facts in addition, even if in this case, this court were to say, throw Psaki out the window, we still have sufficient reasons to suspect that Carson could be armed and dangerous based on his criminal history and what they had just found, seen him doing in Aston Park garden apartments. So they had seen him in particular with Calvin Washington engaging in what they understood looked like drug trafficking and among a group of people who were carrying firearms. They never saw him specifically carrying a firearm. But as officer Escobedo is the person who said this was a known, a person we knew and a person we knew presented a danger to us, be potentially, and of course the Supreme Court has recognized many times how dangerous traffic stops are for police officers. In this case, it was reasonable for them to determine that he could pat him down. If your honors don't have any further questions, the United States respectfully requests this court affirm the judgment of the district court. Thank you. Thank you. Ms. Baldwin. Thank you, your honors. So the government laid out the three prongs here that they have to meet. This was a warrantless seizure. It's the government's burden to prove that it was reasonable and it's failure to prove that Cortel stayed on a mission up until Hayes developed probable causes fatal to that claim. As the government has just now admitted, whether it was 5, 10, 15, a minute in, they acknowledge they do not know what Cortel was doing in the car, but we do know that he admitted to going off task by looking at the vehicle's criminal history and its registered owner's criminal history. And I just want to correct two things. The government said that he was also looking up the statutory subsection, JA 249, Cortel acknowledged he didn't recall if he did that before talking about the drug dog or after. And then JA 219 to 220, he acknowledged that he was not looking, that he only looked for his citation book after the drug dog discussion. So those events were not occurring during the two minute frame that Cortel was in his car where he went off mission. So, counsel, let me make sure I understand one thing about the two minutes and the thirty-second issue. So, putting aside burden of proof right now, isn't it correct that if, that what would have to have happened is that the detouring activity, you know, or that the officer was not doing legitimate work relating to the traffic stop for more than thirty seconds? So not necessarily because if Cortel had checked Washington's license in the first five seconds, then checked the registered owner's criminal history at six seconds, then went back to looking at proof of insurance, so it could have flip-flopped it back in between the two. The problem here is we know Cortel went off mission and contrary to Rodriguez, the government failed to show that he diligently pursued the suspended license investigation without going on a fiction expedition. Do we, recognizing that government has the burden at the motion to suppress hearing, don't we construe the facts in the light most favorable to the government when a denial is appealed? Yes, that is true, but the, viewing the evidence in the light most favorable can't cure evidence of definitory deficiency or gaps in and of themselves. If I have the burden to prove a notice of appeal was filed on January 1st, and I submit an affidavit saying I filed it sometime between December 31st and January 2nd, I don't think anyone would say I proved more likely than not I met my burden. And that is what essentially the government did here. Like he did something in the car, we don't know when, but like maybe it didn't. And so we'd say the evidence in the light most favorable does not help the government because they simply failed to show Cortel's actions in the car, notwithstanding his admission to doing tasks that were off mission. And then going on to just the second point, which is the prolongation. How long does not matter? The fact that their traffic stop should have taken 10, 15, the fact that Cortel was engaged in tasks of whatever length necessarily added time to the stop. Because rather than looking for his citation book to complete the stop, he would instead spend that time going off mission by looking at the criminal history of the register. So I think he did have to, I think booting up the computer, I would say is required. So I think he couldn't identify when exactly he did that. So he thought maybe he did. But nonetheless, yes, that was part of what... No, he had to do it in order to do the additional. He couldn't look up, I would assume he couldn't look up the registration or any of that stuff without booting up the computer, right? Right. And just real briefly on the going back and forth, I'm trying to see if that would matter. Let's say he went, did some stuff that you say was permissible in response to the traffic violation, and then kind of did some stuff that you think was a detour. I mean, wouldn't it instill our question whether the evidence and the like most favorable to the government would be that the undeniably proper things take more than 30 seconds? Because even if he flip-flopped, the issue is whether it's prolonged. And it seems to me, I'm not understanding how the possibility that they did some things that you say were okay, and some things that you say were not, maybe not consecutively makes any difference. So my time's up. Yeah, sure. So it does matter in the sense, you know, the third circuit in the Hurricane said the problem is any break in the mission taints the stop, because it's the result of unreasonable delay. So whenever it happens, regardless of whether or not other things remain to be done, doesn't matter. And so, I'm sorry, I feel like you have made a couple of points in the question, and I only recalled some of them. No, I think you answered. No, I think you made, you responded. I'm sorry, and then the other thing I wanted to say is, I don't think we can assume how long the appropriate inquiries had. There was simply no testimony on that, one way or the other. I have no idea how long any of that takes, and I've looked at a number of these suppression motions. It often doesn't matter. The problem is, it mattered in this case, and the government didn't show it. So if there are no further questions, I appreciate your time. Thank you, Your Honor. Thank you, Counsel. And I note that you're court-appointed, is that right? And we appreciate your work in this matter. That makes us able to do the work we do, and thank you very much for doing that. Ms. Ray, thank you for your service to the government. Thank you. All right. We'll come down and greet counsel and adjourn court until tomorrow morning.
judges: A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin, Nicole G. Berner